UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| H. FREDERICK PETERSON, as owner of the marine vessel LOFOTEN SPIRT,<br><br>Plaintiff,<br><br>v.<br><br>JAMES R. ALLEN, JOHN A. AYDELOTTE, and LISA M. AYDELOTTE, as individuals, and JOHN M. AYDELOTTE, as owner, d/b/a MARINE SERVICES & ASSIST BOATYARD, a Washington sole proprietorship,<br><br>Defendants. | IN ADMIRALTY<br><br>Case No. C07-1866 MJP<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

Having heard evidence from the parties in the above matter during a bench trial held on February 23, 24, and 26, 2009, the Court makes the following findings of fact and conclusions of law:

**Findings of Fact**

1. Plaintiff H. Frederick Peterson ("Rick Peterson") is now and since 1993 has been the owner of LOFOTEN SPIRIT, a 58 foot pleasure vessel.

2. Defendant MARINE SERVICES & ASSIST BOATYARD is a sole proprietorship, owned and operated by JOHN M. AYDELOTTE, which is located in Deception Pass and does business in Washington as a professional marine salvage and towing company, a vessel assist

FINDINGS OF FACT AND CONCLUSIONS OF LAW — 1

subcontractor, and a full service boatyard. JAMES R. ALLEN and JOHN A. AYDELOTTE are employees and/or crew of Marine Services (hereinafter collectively "MARINE SERVICES"). The MARINE SERVICES salvors are highly experienced, professional, and familiar with the area in and around the Swinomish Channel.

3. At Mr. Peterson's request, Troy Schlaitzer, Paul Benedict, and Don Oestheller operated the LOFOTEN SPIRIT on September 7, 2007 as the vessel left Anacortes, Washington and traveled towards Seattle, Washington. Mr. Peterson and all parties onboard understood that Troy Schlaitzer was to pilot the vessel with the assistance of Mr. Benedict. Mr. Oestheller was simply a passenger.

4. Mr. Benedict is employed as a project manager for Plaintiff's construction company, Retaining Walls Northwest. In his role as project manager, Mr. Benedict has the authority to sign business contracts and make business decisions for the company. Mr. Peterson owns the LOFOTEN SPIRIT in his capacity as an individual; the vessel is unrelated to the business of Retaining Walls Northwest.

5. Mr. Oestheller is also employed by Mr. Peterson and performs mechanical work for Retaining Walls Northwest. Mr. Oestheller has performed mechanical work on the LOFOTEN SPIRIT.

6. During the early evening of Friday, September 7, 2007, while Mr. Schlaitzer was at the wheel, LOFOTEN SPIRIT grounded on the rocks in the Swinomish Channel near La Conner, Washington. The LOFOTEN SPIRIT was high centered on a rock jetty on one side of the Swinomish Channel right next to channel marker #15, listing slightly forward and to the side. As a result of the grounding, LOFOTEN SPIRIT was taking on water, its starboard transmission was severely damaged, and oil was leaking in the engine department.

7. Swinomish Channel is part of Puget Sound and is navigable water. The Swinomish Channel presents many dangers to the inattentive boater as it is lined with rocks on both sides and is subject to dramatic tides and currents.

FINDINGS OF FACT AND CONCLUSIONS OF LAW — 2

8. The weather at the time of the grounding of LOFOTEN SPIRIT was calm and clear, with a setting sun. Calm weather continued through the following morning.

9. After the grounding, Mr. Schlaitzer called Mr. Peterson on his cell phone. Mr. Peterson's phone records show that he received a phone call from Mr. Schlaitzer at 7:36 PM and another at 7:44 PM and that each phone call lasted for five minutes. During these calls, Mr. Peterson instructed Mr. Schlaitzer not to leave the LOFOTEN SPIRIT and to try to get the LOFOTEN SPIRIT to a boatyard.

10. Also after the grounding, Mr. Oestheller used his cell phone to call 911, which directed him to the United States Coast Guard ("USCG") in Anacortes. The USCG then contacted Defendant JOHN A. AYDELOTTE requesting availability of commercial assistance as a result of the reported grounding. The USCG provided MARINE SERVICES with cell phone numbers for persons aboard the LOFOTEN SPIRIT.

11. MARINE SERVICES then contacted Mr. Oestheller aboard the LOFOTEN SPIRIT to determine whether the LOFOTEN SPIRIT wanted to accept commercial assistance from MARINE SERVICES, and Mr Oestheller requested their assistance. Mr. Oestheller had examined the vessel's engine and held the opinion that the LOFOTEN SPIRIT could not remove itself from the area without assistance.

12. MARINE SERVICES dispatched S/V ASSIST PATROL, a 21 foot Glasply utility fast response vessel labeled "VESSEL ASSIST" in 14 inch tall reflective lettering on the side of the vessel, which arrived on the scene of the LOFOTEN SPIRIT at approximately 8:30 PM. Upon arrival, MARINE SERVICES took a number of pictures and conducted a thorough inspection of the LOFOTEN SPIRIT to determine the extent of the damages. MARINE SERVICES determined that the LOFOTEN SPIRIT's transmission was split in half, the shaft log on the starboard side was completely destroyed, and the LOFOTEN SPIRIT was taking on water.

FINDINGS OF FACT AND CONCLUSIONS OF LAW — 3

13. MARINE SERVICES explained to everyone aboard the LOFOTEN SPIRIT that it was a salvage situation, discussed the improbability of the LOFOTEN SPIRIT removing itself from the hard grounding, and the damages that could result from the LOFOTEN SPIRIT taking on more water and remaining on the rock jetty overnight through a low tide.

14. At around 9:12 PM, MARINE SERVICES presented Mr. Schlaitzer with a form no-cure no-pay Salvage Agreement. Mr. Schlaitzer refused to sign the Agreement because it contained a compensation clause that states: "Owner shall pay Salvor 20 percent of the net salved value brought to safety." (Ex. No. 2 at ¶ 1.) According to the Agreement, the net salved value would be determined by subtracting the costs of repairs "from the insured value[] of the vessel ... or the fair market value of the property prior to casualty, if that is higher[.]" (Id. at ¶ 4.)

15. Mr. Benedict then reviewed the Salvage Agreement. Mr. Benedict represented to MARINE SERVICES that he was an employee of Plaintiff, that he had authority to sign contracts on Plaintiff's behalf, and that he could pay with a company credit card for Plaintiff.

16. In reviewing the Salvage Agreement, Mr. Benedict specifically questioned the compensation clause stating that the payment for the salvage would be 20% of the value of LOFOTEN SPIRIT. MARINE SERVICES' personnel indicated that the 20% was a cap or a ceiling, and the actual cost would be negotiated after the salvage was complete.

17. Mr. Benedict's cell phone was not in service during this time because it had lost its battery charge. Mr. Peterson called Mr. Schlaitzer's cell phone at 9:01 PM and the call lasted for 18 minutes until 9:19 PM, and then Mr. Peterson again called Mr. Schlaitzer's phone at 9:25 PM and the call lasted 13 minutes until 9:38 PM. These calls were in progress at the time that MARINE SERVICES presented the Salvage Agreement to Mr. Schlaitzer and Mr. Benedict.

18. During this time, MARINE SERVICES personnel believed that Mr. Schlaitzer and Mr. Benedict were talking with the owner of the vessel about the terms of the Salvage Agreement. MARINE SERVICES personnel offered to speak with the owner about the situation, but MARINE SERVICES never spoke with Mr. Peterson on the phone.

19. The Court does not find credible the testimony that Mr. Schlaitzer and/or Mr. Benedict did not inform Mr. Peterson of the Salvage Agreement and its terms during phone calls made between 9:01 PM and 9:38 PM. Plaintiff did not present any credible alternative explanation of the substance of those 31 minutes of conversation, and the recollections of both Mr. Schlaitzer and Mr. Peterson concerning the timing and length of the calls are contradicted by evidence contained in their phone records.

20. After the second phone call ended at 9:38 PM, Mr. Benedict signed the Salvage Agreement. The Court finds that Mr. Benedict had express authority from Mr. Peterson to sign the Agreement on his behalf.

21. Once the Salvage Agreement was signed, Defendant JAMES R. ALLEN remained aboard the LOFOTEN SPIRIT to patch the leak and de-water the LOFOTEN SPIRIT while Defendants JOHN A. AYDELOTTE and LISA M. AYDELOTTE returned to MARINE SERVICES' facility in Deception Pass to get MARINE SERVICES' larger and more powerful S/V ABLE, a 44 foot salvage/rescue tug. At that time, Defendant JAMES R. ALLEN did effectively patch the leak on the LOFOTEN SPIRIT temporarily while he waited for S/V ABLE to return.

22. MARINE SERVICES returned to the scene of the LOFOTEN SPIRIT with S/V ABLE at around 2:17 AM on September 8, 2007. MARINE SERVICES waited until it was closer to high tide, which was at 2:51 AM, and then attempted to remove the LOFOTEN SPIRIT from the rock jetty. After multiple attempts, MARINE SERVICES did successfully free the LOFOTEN SPIRIT from the rock jetty.

23. MARINE SERVICES then towed the LOFOTEN SPIRIT a short distance to a nearby shipyard, Latitude Marine Services, in La Conner, Washington for emergency haulout. During the tow, LOFOTEN SPIRIT struck the bottom, but the tow was able to continue without stopping.

FINDINGS OF FACT AND CONCLUSIONS OF LAW — 5

24. Upon arrival at Latitude Marine, Mr. Benedict signed a second contract on behalf of Mr. Peterson, MARINE SERVICES' Redelivery Certificate, which was witnessed by Patrick Gudmundson, the owner of Latitude Marine. Mr. Benedict then signed a third contract on Mr. Peterson's behalf, a Work Order presented by Latitude Marine Services.

25. At the time of the grounding, the insured value of the LOFOTEN SPIRIT was $900,000.

26. The Court finds that fair market value of LOFOTEN SPIRIT at the time of the grounding was $660,000, as established by credible expert testimony given by marine surveyor Richard Blomquist

27. The total repairs to LOFOTEN SPIRIT for the grounding damage cost $81,815.26. Therefore, the value of the property salved was $578,184.74.

28. No party presented any evidence concerning the monetary value or hourly rate for salvage services. No evidence was presented that compensation totaling 20% of the value of the vessel is outside the industry standard for salvage contracts.

## **Conclusions of Law**

29. This Court has jurisdiction because this is an admiralty claim for salvage on navigable waters.

30. Mr. Benedict had the express authority of Plaintiff to sign the Salvage Agreement. At the time of signing, both Plaintiff and MARINE SERVICES understood that the $180,000 award identified in the compensation clause (20% of the insured value of the vessel) was a cap or a ceiling, and the actual cost would be negotiated after the salvage was complete. Nonetheless, the parties failed to negotiate further after the salvage operation.

31. No evidence in the record suggests that a 20% term in the compensation clause of a no-cure no-pay salvage agreement is unreasonable or falls outside the industry standard.

32. However, the Court finds that it is unreasonable to calculate a salvage award based on a percentage of the $900,000 insured value of LOFOTEN SPIRIT. Because the market value of

FINDINGS OF FACT AND CONCLUSIONS OF LAW — 6

the boat at the time of grounding was only $660,000, enforcing the Salvage Agreement as written would provide Defendants with a windfall because the calculation would produce a number that is inconsistent with the value of what was salvaged. The Court further finds that although the contract has an integration clause, both parties viewed the contract as subject to negotiation and the 20% figure in the compensation clause was not fixed. The Court therefore finds the terms of the Salvage Agreement unreasonable and sets it aside.

33. Having set the contract aside, the Court finds that MARINE SERVICES is entitled to a salvage award based on pure salvage in lieu of contractual salvage. In arriving at the amount of this award, the Court has considered the traditional admiralty principles for salvage (the "Blackwall factors"). See The Blackwall, 77 U.S. (10 Wall.) 1.

34. The Blackwall factors include: (1) the degree of danger from which the vessel was rescued; (2) the post-LOFOTEN SPIRIT value of the property saved; (3) the risk incurred in saving the property from impending peril; (4) the promptitude, skill, and energy displayed in rendering the service and salvaging property; (5) the value of property employed by the salvors and the danger to which is was exposed; and (6) the costs in terms of labor and materials expended by the salvors in rendering the salvage service. The Court's finds the following for the Blackwall factors:

35. The LOFOTEN SPIRIT was rescued from a high degree of danger because of the location and timing of the grounding. The LOFOTEN SPIRIT was hard aground on a rock jetty near the edge of the Swinomish Channel. One of the LOFOTEN SPIRIT's transmissions was blown apart and inoperable, the propellers were thrashed by the rocks, the propeller shafts were bent, the LOFOTEN SPIRIT's engine compartment was filled with oil and water and the LOFOTEN SPIRIT was taking on water. Without assistance from MARINE SERVICES, the LOFOTEN SPIRIT would have remained stranded without power, sinking during a receding tide.

36. The risk MARINE SERVICES incurred in saving the vessel was high. The

FINDINGS OF FACT AND CONCLUSIONS OF LAW — 7

Swinomish Channel is a perilous passage with unmarked rocks, strong currents, and shallow depths. During the salvage operation, MARINE SERVICES was exposed to dangers including grounding, snapped ropes or cleats, pollution and/or fuel leaks, further damage to the LOFOTEN SPIRIT, and strain on gear and equipment.

37. MARINE SERVICES showed promptitude and skill in responding to the LOFOTEN SPIRIT's request for assistance and in salvaging the grounded vessel. MARINE SERVICES responded to the request for commercial assistance and arrived on the scene of the LOFOTEN SPIRIT in just over one hour of being initially contacted by the USCG. After assessing the situation, MARINE SERVICES dispatched their appropriate assisting vessel S/V ABLE, which arrived at the scene prior to high tide so that they were in position to remove the LOFOTEN SPIRIT from the rocks at the peak of high tide. MARINE SERVICES displayed skill in freeing the LOFOTEN SPIRIT from the rock jetty without further damage, and in towing the LOFOTEN SPIRIT through difficult passage with unmarked hazards to the nearest boatyard with only minor incident en route.

38. MARINE SERVICES employed its own valuable property in the course of the salvage operation and exposed it to danger.

39. MARINE SERVICES expended significant cost in labor and materials during the salvage operation.

40. In light of these factors, the Court awards MARINE SERVICES 20% of the value of the salved property. The Court has found that the value of the property salved was $578,184.74, therefore MARINE SERVICES is entitled to $115,636.94 as a salvage award. MARINE SERVICES is also entitled to prejudgment interest on the salvage award.

41. Finally, the Court does not award Defendants their attorney's fees. "It is the general rule that attorney's fees are not awarded in admiralty cases[.]" <u>Offshore Marine Towing, Inc. v. MR23</u>, 412 F.3d 1254, 1256 (11th Cir. 2005) (internal citations omitted). The Court does not find that this case presents exceptional circumstances that merit a deviation from this general rule.

DATED this 10th day of March, 2009.

*[signature]*

Marsha J. Pechman
U.S. District Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW — 9